IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES of AMERICA,

      v.               Case 1:21-cr-10350-1 LTS

HARRY K. TAM,
      Defendant.

REVISED MOTION TO SUPPRESS WIRETAP

Preliminary

Defendant, Harry K. Tam, by his counsel, Kevin L. Barron, Esq., respectfully moves the Honorable Court for an order suppressing the fruits of a March 3, 2021, order for interception of wire and electronic communications over target telephones 1 and 2 ("TT-1" and "TT-2") together with an April 2, 2021, renewal for TT-1.

The wiretaps should be suppressed, and their product excluded from evidence as "fruits of the poisonous tree" and for violations of the Wiretap Act.[1]  First, it appears upon review of the government's discovery that this investigation stopped in November 2020 with the arrests of seven of the wiretap order's ten target subjects, over four months before the government's application for the wiretap.  The wiretap applications were based on stale information and lacked probable cause for issuance not only because of the arrests of co-conspirators, but also for the cessation of alleged conspiratorial activity, for defendant's attempts at detoxification and because of other changes in the totality of the circumstances in the months before the wiretap application.  Secondly, the government did not reasonably minimize "the interception and disclosure of communications not relevant to the investigation or otherwise criminal in nature" as directed in

---

[1] Title III of The Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. 90-351; 6/19/68.

the May 3, 2021 ,wiretap order, p. 7 (Bates No. USAO 0001394).  Particularly, numerous highly private, sensitive conversations with defendant's sister, mother and "wife", having no connection to the targeted offense conduct or other criminal activity, were intercepted and recorded in full unreasonably and in violation of the said wiretap orders.

FACTS

A.   Start of the Investigation

Defendant Harry Tam, 42 years old, is a skilled auto mechanic with strong ties to his family in San Jose, California.  He moved to the Boston area from California in 2016 and was employed as the manager of a Midas auto repair shop at 120 Boylston Street in Brookline.

According to United States Drug Enforcement Agency ("DEA") Form 6 reports ("DEA-6"), on February 27, 2020, state law enforcement executed a search warrant in California at the San Jose residence of Dominique Cabrera.  Postal receipts seized in the search showed that Cabrera had sent a four-pound package to one Glen Davis care of the Midas shop in Brookline. See, TFO Callahan's March 3, 2021, affidavit in support of wiretap application, ¶¶23 - 24.

According to further DEA-6's, Burlington Police Department began its investigation of Mr. Tam in March of 2020 based on statements of an unnamed "source of information" accusing Mr. Tam of selling drugs from the Midas auto repair shop.  DEA task force officers ("TFO's") started a surveillance operation at the Midas shop on March 28, 2020.  The TFO's watched people come and go from the shop and recognized some as having drug-involved criminal records.  They caused a pole camera to be installed near the Midas shop in June of 2020 and were able to observe and record all the activity there day and night.  The government's discovery reveals that the TFO's produced about 17 DEA-6's for this period, observing Mr. Tam's interactions with co-defendants Marcus Leyden and Henry Vuong, among others.  TFO's were

able to observe deliveries of US Postal Service packages and the comings and goings from the Midas shop.  The camera allowed reading of license plates and let DEA know identities of some visitors to the shop.

B.      <u>Interception of Kilogram of Methamphetamine on July 30, 2020</u>

On July 30 and 31, 2020, US Postal Inspectors identified a suspicious two and a half-pound priority mail package from San Jose, California addressed to "Jacob Rodriguez" - like Davis, another actual employee at the Midas shop - and obtained a search warrant in this District. The Postal Inspectors found a kilogram of a methamphetamine-like substance.  (This was to be the only confirmed seizure of narcotics before March 3, 2021, issuance of the wiretap order.)  As defendants attempted to track and locate the missing package, a Postal Inspector went to the Midas shop and gathered evidence to tie the addressee of the package to Mr. Tam.

C.      <u>Arrests and Varying Detentions of Nearly All the Targets - Investigation Stops</u>

But for the one-time surveillance of co-defendant Tony Nguyen in San Jose on November 6, 2021, the investigation appears to have stopped for over four months, between early October 2020 and the March 3, 2021, wiretap application.

After the July 31 intercepted methamphetamine package, the reports indicate that TFO's continued their surveillance operation until the arrests of co-defendants Henry Vuong ("Vuong") and Marcus Leyden on September 10 and October 13, 2020 (respectively).  The investigation appears to have halted then for four months (but for a November 6, 2020, surveillance of defendant Nguyen in San Jose) until obtaining the wiretap on March 3, 20210.  Location monitoring appears to have been allowed lapse on November 7, 2020, until revived after the March 3, 2021, wiretap order.

Numerous state-law arrests of co-defendants and other targets may have been one reason to have stopped the investigation. Co-defendants, Henry Vuong, Marcus Leyden, Robert Ostrander, James Colamaria and Vincent Duong and targets Daniel McLaughlin and Amanda Nolan were arrested by state authorities on various dates in late 2020. Some remained in detention and others were detained and released for different periods and under differing bail conditions. Boston Police arrested Vuong on September 10, 2020, on an OUI charge and a consent search of his car yielded drugs and guns. Vuong was detained at the Suffolk County jail and made calls to Mr. Tam. Vuong was later released in December 2020 on condition of monitoring. In September, Leyden eluded a task force stop of his U-Hall van and committed a carjacking to continue his flight. TFO's arrested Leyden on October 13, 2020, at a Watertown motel on a fugitive warrant and execution of a search warrant for their rooms yielded guns, drugs, distribution paraphernalia and other evidence. Leyden has remained detained and has warrants for open matters in California. Ostrander was arrested on a number of occasions starting in May of 2020 and released and eventually detained in this case. McLaughlin, as mentioned, was arrested on October 13, 2020, and has remained in detention on state matters and in this case. Colamaria was not arrested until February 26, 2021, by state authorities and eventually detained.

Electronic surveillance measures also appear to have stopped. Based on counsel's review of "N" exhibits provided in discovery, precise locations on the numbers that later became TT-1 and TT-2 were obtained as late as November 7, 2020[2] and not obtained again until March 7.[3]

---

[2] Tam's phone and identity documents in the phone case were stolen by a co-defendant on November 7, 2020.
[3] The "ping" warrant applications for TT-1 phone were obtained on September 4 and October 8, 2020. Subsequent applications were made for pings beginning on March 7 and ending in May 2021.

Location monitoring of Mr. Tam does not appear to have begun again until the March 4, 2021, start of the wiretap.

Not only had precise location monitoring and surveillance of Mr. Tam ended in November 2020, but the TFO's had ceased to make reports.  Presumably, surveillance of Tam had ceased with the arrest of Vuong, Leyden and others (like Daniel McLaughlin and Jarrod Waldon, unindicted co-conspirators charged in state court serving sentences).  Other than the single November 6 surveillance in San Jose and the November 27, 2020, DEA-6 reporting on a call with Henry Vuong in which Tam mentioned his termination, the last DEA-6 is dated October 22, 2020, concerning the arrest of Marcus Leyden.  The next DEA-6 is dated March 3, 2021[4] and concerns issuance of the Title-III authorization.

D.    Tam Announces Retirement in Recorded Calls

The TFO's also obtained recordings of outgoing jail calls from Henry Vuong to Mr. Tam in which Harry Tam told Vuong that he was "retired".  In the transcript of an October 4, 2020, call, "Tam says that he doesn't want to do business with Dal because he's retired from the business" (making it difficult to tell whether Dal or Tam had retired).  Bates No. TAM 000113. In the audio recording of the call, Mr. Tam says "I am retired".  TFO's also learned in late November 2020 that Mr. Tam had lost his position as manager of the Midas shop.  Listening to further recorded jail calls by Vuong to Mr. Tam, agents heard Mr. Tam explain how he had been fired from his position as the manager of the Midas shop on November 19, 2020.  Given that Tam had not been fired at the time of the October 4 call, the only inference to draw from the

---

[4]  TFO Callaghan's March 3, 2021 affidavit ("Callahan Affidavit"), ¶¶75 - 83, discussed two events, statement from two criminal suspects of Tam making small drug distributions (called "SOI-1" and "SOI-2").  These SOI were apparently being investigated and managed by Somerville and Boston Police Departments.  No Somerville or Boston reports were provided.  These events are discussed in the section below concerning the Callahan Affidavit.

announcement of retired was that Tam's statement that he had "retired" meant that he had ceased the alleged target offenses.

E.    Tam Struggles with His Addiction and Teenage Son's Stroke

Had the government continued its investigation of Mr. Tam from November 2020 until the March 3, 2021, wiretap application, it would have discovered that Tam was struggling with his addiction and with a family tragedy.

Mindful of his compromised health and the arrests of Vuong and Leyden and six other targets, Tam began attempting "cold turkey" withdrawal from amphetamines at home in Allston. On November 11, defendant and family took a scheduled vacation to Florida.  When he returned from vacation on November 19, Mr. Tam learned that he was being terminated from his employment.

Mr. Tam continued in his own attempts to detoxify with intermittent success.  He and his wife and children would occasionally leave the house to stay in air b and b rentals in nearby towns like Randolph.  Tam struggled with his addiction and used intermittently.  Eventually, his wife obtained a restraining order with which Mr. Tam was never served.[5]

In early February 2020, Mr. Tam's teenage son suffered an aneurism and stroke from which the young son has still not recovered.  Family texts from Harry Tam, February 8 - 27, 2021, Ex. A.  Mr. Tam traveled to California to visit his son and visited his sister and father.

F.    Callahan Affidavit in Support of Wiretap Application

1.    Wiretap Affidavit Attempts to Remedy Stale Information

The March 3, 2021, affidavit of TFO Callahan in support of the wiretap application ("Callahan Affidavit") attempts (but fails) to refresh the stale investigation.  It mentions two

---

[5] Tam was arrested on the basis of this restraining order on May 3, 2021 at the time of the search of his Allston home.  The case was dismissed in state district court the following day because the order had never been served.

contacts with known drug dealers, one in Somerville on January 8, 2021, and another in Boston

on January 21, 2021.  (Callahan Affidavit, ¶¶75 - 83.)  It also discusses activity on mobile phone

lines that were to become TT-1 and TT-2 for the period February 2 - 22, 2021.  None of these

attempts at backfilling the stale investigation are sufficiently specific or detailed to find probable

cause that Mr. Tam had continued to distribute narcotics and that a wire for TT-1 would contain

evidence of the target offenses at the time of the March 3, 2021, warrant application.

    2.    SOI-1

In the first instance, the affidavit cites "source of information" called "SOI-1".  SOI-1

claimed that Tam visited him to collect drug money from SOI-1 on January 8, 2021.  In fact, the

objective evidence is inconsistent with this statement.  Callahan Affidavit, ¶¶75 - 80.  SOI-1 is a

sometime informant with an "extensive criminal background".  The affidavit claims SOI-1

information is reliable, but the affidavit notes that "[given SOI-1 's ongoing criminal activity,

investigators do not intend to elicit cooperation from SOI-I."

Other than Tam's presence observed by unnamed police officers, nothing from SOI-1

should be credited.  SOI-1 informed Somerville Police about a visit by Tam to SOI-1's shared

residence (with other drug involved persons) at Perkins Street in Somerville.  SOI-1 had received

unspecified "benefits" for his cooperating with Somerville Police and providing information

"intermittently".  ¶75.  (There is no mention of SOI-1 ever testifying for law enforcement or

giving information in support of a warrant.)

Unnamed officers (presumably a Somerville stakeout) saw Tam enter the Perkins Street

building and leave 30 minutes later.  ¶76.  Later, SOI-1 claimed that Tam had picked up drug

money, not delivered drugs.  The phone contacts showed 11 calls and six texts between January

7 and January 8, one call and three texts from SOI-1 to TT-2.

The 30-minute stay, if of any value, would be consistent with Tam using drugs on premises or obtaining them for personal use, not with the charged offenses.  Collecting money is wholly inconsistent with a 30-minute stay.

3.      SOI-2's Information Not Credible

The Callahan Affidavit also cites SOI-2, arrested by Boston PD on motor vehicle charges on January 19, 2021.  ¶¶81 - 83.  Like SOI-1, "[g]iven, SOI-2's ongoing criminal activity, investigators do not intend to elicit cooperation from SOI-2."  SOI-2 cooperated with police "in the hopes of receiving consideration on his pending charges."  ¶81.  SOI-2 gave police Tam's description with a similar vehicle and claimed he had sold SOI-2 meth and showed him a gun. SOI-2's phone showed contact with numbers that would later become TT-1 and TT-2 between January 17 and January 20, 2021.

SOI-2 later produced the attached redacted written statement denying and disavowing the making of any statement subsequent to his arrest as set forth in the Callahan Affidavit.  ¶¶81 - 83.  This written statement is made in connection with his state-court arrest report by the TFO's and his prosecution in Brighton District Court: "I did not make any comments pre- or post-Miranda to any officers or agents. There are many falsifications, lies and not truths listed in this report and I am willing to testify to this."  Ex. B.

4.      Phone Metadata

The Callahan Affidavit attempts to remediate moldy probable cause without conducting surveillance, tracking FedEx packages, obtaining location information or conducting a DEA investigation for credible informant statements.    In the context of the prior arrests of Vuong, Leyden, Ostrander, Duong, McLaughlin, Nolan, Calamari and Jarrod Waldon, it would be less likely than not that such communications were evidence of further conspiracy - especially where

there has been no further evidence of delivery of packages after November 7, 2020.[6]  Nearly all the alleged conspirators and other target were in jail, on conditions of release or simply lying low.

For this reason, the Callahan Affidavit tries to paint over staleness with raw metadata about TT-1 having over 1,500 calls and 4,400 text messages for the 21 days between February 2 and February 22, 2021.  ¶¶84 - 85.   Call data for communications with co-codefendant Robert Ostrander and with unindicted alleged co-conspirators Dominique Cabrera (resident in San Jose and suspected supplier) and Ashley Padova for the time from February 2 to February 22, 2021, are offered without any non-stale investigative context. The mere existence of calls without intercepts, surveillance or even location data does not support probable cause that the target offenses are being committed and that a wiretap will yield evidence of the target offenses.

Had TFO's tried to obtain current intelligence or even location data on Mr. Tam for February 2021, the month preceding the wiretap application, they would have found that one reason for the phone traffic (and for Tam's trip to California) was his teenage son's stroke.  See Ex. A, text messages with pictures among Tam, his sister, brother and father for February 2021. While the Callahan Affidavit offers no breakdown of most-frequently called phone numbers, they could also have established easily that many of these calls were made to Mr. Tam's family. Tam's sister, brother and mother are all on the same family phoneline plan.  This would have been apparent from phone company account information provided in response to warrants for location data provided by July of 2020.

---

[6] Although there are no DEA-6's for the period, TFO's had continued their surveillance of the Midas shop until the last week of November 2020 and determined there was no drug activity there.  See, Callahan Affidavit, ¶103.

5.      Statement of Necessity Shows Staleness

The Callahan Affidavit's statement of necessity (¶¶86- 138) corroborates the staleness of

this investigation.  Some grounds are obviously stale, like the claim that traffic on Route 9 at the

Midas shop made surveillance difficult (¶103); Tam had been discharged from the Midas shop

four and a half months earlier.  Likewise, the claim that GPS attachments to automobiles were

unavailing because Tam drove different customer cars (¶136) was also stale; again, Tam had

been fired on November 18, 2020.  So too: the claim about the trash pulls from dumpster at the

Midas shop being under camera surveillance (¶126); being unable to distinguish between

legitimate Midas customers and investigative targets (¶128); the pole camera being unable to see

inside the Midas building (*id.*).  (The presence of these stale necessity claims leaves the

impression that the affidavit and application had been drafted before late November 2020 when

Tam was fired.)

Maintaining that Tam's discharge from the Midas shop necessitated the wiretap was itself

a stale claim.  Callahan Affidavit, ¶103 - 115.  The Midas shop was no longer relevant because

Tam was at home and not at work and agents had already installed a camera outside Tam's

residence.  Not only had the Midas shop ceased to be an alleged delivery point, but TFO's

already knew that Nguyen had been the source of alleged supply (see paragraph next above) and

Nguyen's packages were being shipped by Fed Ex to Vuong in Canton.  TFO's knew this because

they had a pole camera trained around the clock on Tam's house with a view of both sides of the

street (contrary to what is claimed in the Affidavit ¶129[7]) and the front porch where deliveries

---

[7] There is a significant discrepancy between statements in the affidavit and in DEA-6's over the ability of the pole
camera to view comings and goings in the street at Tam's Allston house.  The Affidavit at ¶129 says that "[t]he
location of the camera, however, *only allowed a view of the front door and the street was not visible*. Therefore,
when TAM left the residence the camera would *not be able to view where he went on the street* or, if others were
visiting the residence, the direction from  which they came." [emphasis added]  To the contrary, an April 30, 2021

would be made.  ¶129.  (The absence of DEA-6's from the San Jose office between November 6, 2020, and March 6, 2021, also tends to show that Nguyen was inactive or that the investigation had lapsed.)

The claims about difficulty in tracking packages after the alleged change from use of USPS to Fed Ex had also long ceased to be relevant.  The investigation knew or should have known of Tam's difficulties and his struggle to detoxify.  Whether temporary or permanent, the reasonable inference to draw from totality of the circumstances - such as the cessation of deliveries, the October 4, 2020, recorded call with Tam that Tam had "retired" - was that Tam had stopped.  The Callahan affidavit claims that after seizure of a package of methamphetamine on July 31, 2020, the defendants stopped using the US Postal Service and changed to Fed Ex. ¶88.

G.    Failure to Minimize

Intercept recordings contain calls more than two minutes long with Tam's mother and sister that should that have not been minimized.  The first two recorded calls with the sister are highly personal and should have given the task force notice to stop intercepting.  Interception of the calls with Tam's mother should have stopped within a few days when obtaining an interpreter became practicable.

---

DEA-6 (USAO-000318) states that pole camera showed on April 30 that "a Boston Police cruiser arrived on Mansfield Street and 2 uniformed officers arrived and met Jade CHIN on the front porch of the residence" and "[a] short time later Harry TAM is observed being escorted from the residence by a uniformed officer. . . . TAM is observed walking away from the property with his backpack and his dog."  Likewise, an April 14, 2021 DEA-6 (USAO 000297) describes pole camera observation of Vuong's arrival at Mansfield Street in his Lexus, and Vuong's entering and leaving Tam's house.  The DEA-6 then states "DUONG went to his vehicle, the grey Lexus sedan, MA REG. 6LB726 (Vehicle # 1) which parked across the street and placed the large brown shopping bag into the driver's side rear passenger seat area. DUONG's vehicle then departed."  This DEA-6 goes on to memorialize fourteen other observations of automobile passengers arriving on Tam's street and going into and leaving his house, including license plate numbers and identities of persons.

1.      Calls with Sister Not Minimized - Defendant's Sister Not a "UF"

Account information provided by the carriers in answer to the March 3, 2021, wiretap order would have shown the investigation the identity of Tam's sister and that she was not a "UF" (unknown female).  In fact, call data from subpoenas and ping warrants throughout most of 2020 would also have given this information and this information was mandated in carrier's response to the March 3, 2021, wiretap order.  USAO 001392 - 001393.  TFO's would have received account information identifying the Tams' family account (under the name of Tam's father) showing that the number Tam called belonged to his sister.   Notwithstanding information on the identity of Tam's sister, the May 3, 2021, affidavit of TFO Callahan in support of the first warrant ("1st Search Warrant Affidavit") to search Mr. Tam's Allston, Massachusetts home describes Tam's sister as a "UF".   Tam's sister was not "unknown".  Agents would have known the identity of "UF"  - i.e., that Tam was calling his sister - before the call began.  The sister's number was in the family account information.

There are at least eight unminimized calls between TT-1 and his sister's number more than two minutes long.  The first two occur on April 20, 2021 - a two-minute call  (TT1 session 3631) about "phone tag" and calling back - and a very private 23-minute April 24 call (TT1 session 4403), neither with any reference to or hint of criminal conduct.  The April 20 call (TT1 session 3631) is a discussion of who called whom first and when to call back some recrimination about not having called earlier.  The call contains no reference to the subject of the wiretap order and is unminimized.  The long April 24 call (TT1 session 4403), also unminimized, should have alerted agents under the circumstances that it was objectively unreasonable to intercept calls between Tam and his sister.  In this 23-minute call, Tam discusses his broken relationship with

his common law wife and mother of two of his children ("wife").  This leads to an extended exchange of about 15 minutes in which the sister attempts to steer Mr. Tam to the conclusion that his addiction is the cause of the breakdown and that the relationship may be irreparable.  The remainder of the call then turns to a detailed discussion of the sister's romantic relationship, her state of mind and some of her private medical information.  It is the kind of discussion that one would be embarrassed to have recorded.  It also told agents that communication between Tam and his sister were not criminally related and not objectively reasonable to intercept.

The next call with the sister's number occurs on May 2, 2021, eight days after agents would have known that such a call was objectively unreasonable to intercept.  See, transcribed excerpt of May 2 call, 1st Search Warrant Affidavit, ¶23.  The information in this unminimized call forms the nexus of the 1st Search Warrant Affidavit to probable cause that evidence would be found on the premises to be searched: "the money and the firearms are still located at the SUBJECT LOCATION".  *Id.* at ¶24.  1st Search Warrant Affidavit, ¶23.  Tam had been removed from his home by restraining order on April 30, 2021 (although not served, BPD officers had earlier notified him of its existence and ordered him off the premises, not a sufficient ground to later arrest him on March 3, 2021).  Tam says in this unminimized conversation that he needs to know that his things are "safe in the house" and that he needs to know that his "money and specifically [his] guns" are going to be safe while he is in a recovery program.

Including the above, counsel finds eight completed voice calls between Tam and his sister on TT1, starting on April 20 and ending on May 8, 2021.  None of these calls were minimized.  The following calls were not minimized in any way, even after it became clear that the calls were unconnected to the target offenses:

> 4/20/21  session 3631, 2.5-minute call  about "phone tag" and calling back
> 4/24      session 4403,  23 minutes highly private

5/2   session 5577  5.5 minutes "the money and the firearms are still located at the
SUBJECT LOCATION".  1st Search Warrant Affidavit  ¶24.
5/5   session 5662, 2.5 minutes about Tam getting arrested and private matters
5/7   session 6183, 3.5 minutes, an emotional discussion about personal issues and
relationships and going to "rehab" tomorrow
5/7   session 6197, 1.5 minutes, private subjects
5/7   session 6199, 24 minutes, private subjects
5/8   session 6265, 6 minutes, private subjects

2.      Failure to Minimize *Any* of 28 Calls in Cantonese
with Mr. Tam's Mother Over 7 Weeks

Counsel identifies 28 unminimized calls from March 11 to April 27, 2021, between TT1

and the mother's phone number, 22 of which were longer than two minutes.  Mr. Tam and his

mother speak Cantonese punctuated by English phrases and conducted in the emotional tone one

would expect with a son in trouble and a young grandson suffering a stroke.  Tam often starts the

conversation greeting his mother with "Hi Mom" or "Ma".  These conversations seem all to end

with a farewell - sometimes with a "bye Ma" in English or in tones that sound like a farewell -

and they do not terminate abruptly in a way that would indicate minimization.  (While foreign

language communication is minimized under §2518(5)[8] as soon as "practicable" instead of

ceasing immediately, there is still a duty to minimize, a duty the government apparently did not

even attempt to discharge here. )  The recordings show the following:

3/4/21  session 63, 6 minutes
3/7     session 471, 2.5 minutes
3/8     session 597, 13 min
3/9     session 711, 5.5 min
3/11    session 101 (new number on TT-1), 19.5 minutes

---

[8] §2518(5) provides as follows in connection with the government's duty to minimize: "Every order and extension
thereof shall contain a provision that the authorization to intercept shall be executed as soon as practicable, shall be
conducted in such a way as to minimize the interception of communications not otherwise subject to interception
under this chapter, and must terminate upon attainment of the authorized objective, or in any event in thirty days. In
the event the intercepted communication is in a code or foreign language, and an expert in that foreign language or
code is not reasonably available during the interception period, minimization may be accomplished as soon as
practicable after such interception. An interception under this chapter may be conducted in whole or in part by
Government personnel, or by an individual operating under a contract with the Government, acting under the
supervision of an investigative or law enforcement officer authorized to conduct the interception."

```
3/13     session 290, 1.5 min
3/13     session 302, 2.5 minutes
3/15     session 542, 1.5 minutes
3/18     session 985, 2 minutes
3/20     session 1252, 3 min
3/22     session 1785, 9.5 minutes
3/25     session 2176, 3.5 minutes
3/30     session 2871, 2 minutes
3/31     session 3104, 1.5 minutes
4/17     session 3253, 6 minutes
4/18     session 3335, 13 minutes
4/19     session 3390, 1.5 minutes
4/20     session 3629, 2.5 minutes
4/20     session 3640, 6 minutes
4/21     session 3740, 3.75 minutes
4/22     session 3852, 2.5 minutes
4/22     session 3920, 6 minutes
4/23     session 4028, 6 minutes
4/23     session 4106, 1.5 minutes
4/25     session 4527, 7.5 minutes
4/25     session 4596, 2 minutes
4/26     session 4713, 4.5 minutes
4/27     session 4750, 3.5 minutes
```

3.     Calls to Girlfriend/Wife/Children's Mother

There are a many attempted calls on TT-1 to the number of Mr. Tam's girlfriend or "wife,

the mother of two of his children.  Counsel finds these unminimized voice messages:

```
3/10/21     session 17, 6 minutes, personal message
4/23        session 4076, 4 minutes, message blocked out by noise
4/28        session 4915, leaves long message about personal matters
4/28        session 4936, 3.5 minutes, long voice message, again, personal
```

ARGUMENT

POINT I:
CONTOURS OF THE LAW

The Fourth Amendment and Title III impose procedural safeguards and substantive

limitations on law enforcement's use of electronic surveillance.  See, *Untied States v. Jones*, 565

US 400, 405 (2012) (applying Fourth Amendment exclusionary rule to data from GPS devices

attached to an automobile without a warrant) citing *Olmstead v. United States*, 277 U.S. 438

(1928); 18 USC §2518(3)(a) ("approving interception . . . if the judge determines . . . that — (a)

there is probable cause for belief that an individual is committing . . . a particular offense

enumerated in . . . this chapter.")   Title III provides for the suppression of wiretap evidence on

the ground that "the order of authorization or approval under which it was intercepted [was]

insufficient on its face." 18 U.S.C. § 2518(10)(a)(ii).

With the passage of Title III in 1968 at 18 U.S.C. §§ 2510 - 2522 "Congress authorized

wiretapping as needed to allow effective investigation of criminal activities while at the same

time *ensuring meaningful judicial supervision and requiring specific procedures to safeguard

privacy rights*." [emphasis added] *United States v. Gordon*, 871 F.3d 35, 43 (1st Cir. 2017) citing

*United States v. Rodrigues*, 850 F.3d 1, 6 (1st Cir. 2017).   The Supreme Court has described

Title III first as "(1) protecting the privacy of wire and oral communications, and" secondly, as

"(2) delineating on a uniform basis the circumstances and conditions under which the

interception of wire and oral communications may be authorized", indicating that protection of

rights is of primary importance.  *Gelbard v. United States*, 408 U.S. 41, 48 (1972).

Title III imposes strict requirements.  Law enforcement must obtain authorization from a

designated senior Department of Justice official (the Attorney General and specific deputies

identified in the statute) before applying to a court for an order authorizing interception of wire, oral or electronic communication in the investigation of a broad but nonetheless limited number of specific crimes.  18 USC §2516(1).[9]  The statute dictates the familiar contents of the affidavit in the wiretap application, including the specifics of the offense, type of communications sought, the identity of the persons whose communications are to be intercepted, an explanation of necessity for the wiretap, the period of the interception and previous applications (if any).  §§2156(b)-(e).  Likewise, Title III requires a court to make certain findings before authorizing interception, namely, that a person is committing an enumerated offense, that the communications to be intercepted will concern the offense, that the "facilities" subject to interception are being used for the offense and that normal investigative techniques are inadequate.  §§2516(3)(a)-(d).

A court's order must be executed as soon as practicable and it must terminate upon "attainment of the authorized objective". 18 USC §2518(5).  The authority of the order must terminate within 30 days of start of surveillance or not more than ten days after entry of the order, unless another necessary 30-day extension for the same purposes is granted upon subsequent application.  *Id.*

Title III also imposes post-authorization duties on the applicants and the court.  See, 18 USC §2518.  Those duties are minimization (§2518(5)), proper sealing of the recorded intercepts and the application (§2518(8)(a)), post-surveillance notice with inventory to the targets and a copy of the wiretap application to the defendants (§2518(8)(d)).

---

[9] While only the Attorney General and certain deputies may authorize wire or oral communications, any government attorney may authorize an application for interception of electronic communications.  §2516(3).

POINT II:
PROBABLE CAUSE WAS STALE;
"SHELF LIFE" PAST EXPIRATION DATE

The Fourth Amendment, of course, requires a court to make a finding of probable cause

before allowing a wiretap.  *United States v. Serrano*, 632 F. Supp. 2d 100, 105 (D. Mass. 2009)

citing *United States v. Santana*, 342 F.3d 60, 65 (1st Cir. 2003).  Determining whether sufficient

probable cause to issue a wiretap order is determined in the same way as other warrants.  See,

e.g., *United States v. Kosta,* Case 1:12-cr-10226-DJC (D. Mass. Oct. 31, 2013) (finding staleness

of warrant application to search premises in marihuana distribution wiretap investigation).

The magistrate considers the facts of supporting affidavits to determine the requisite showing

that there is a sufficient link between probable criminal activity and the area to be searched.  *Id.*

To show sufficient probable cause an  application must demonstrate (1) probable cause to believe

that "an individual is committing, has committed, or is about to commit" a criminal offense and

(2) probable cause to believe that "communications concerning that offense will be obtained

through such interception." *Serrano, supra* citing 18 U.S.C. § 2518(3)(a)-(b).  The facts in the

affidavit must be minimally adequate to support the determination that was made.  *Id.*

"[P]robable cause need not be tantamount to proof beyond a reasonable doubt. . . .  Probability is

the touchstone."  *United States v. Khounsavanh*, 113 F.3d 279, 283 (1st Cir.1997).

The First Circuit's decision a little over a year ago in *Encarnacion,* although an

unsuccessful probable cause challenge for the defendant-appellant, serves as a helpful

benchmark in this case and shows that this motion to suppress the March 3, 2021, wiretap should

be granted for staleness.  *United States v. Encarnacion*, 26 F.4th 490, 497 (1st Cir. 2022).  "It is

common ground that information in an affidavit supporting a wiretap application must be timely,

not stale." *Id.* at 497 citing *United States v. Schaefer*, 87 F.3d 562, 568 (1st Cir. 1996).

Generally, an affidavit in support of a warrant is stale if "it established probable cause at some

point in the past but does not support probable cause at the time of the warrant's issuance."

*Encarnacion, supra.* citing *United States v. McLellan*, 792 F.3d 200, 210 (1st Cir. 2015).

      The government will, no doubt, argue that *Encarnacion* means that information about

narcotics trafficking takes longer to go stale and that the four-month stop in investigation and

distribution activity in this case was insignificant.  While it is true that *Encarnacion* says that

drug information *normally* has a longer "shelf-life",[10] that is simply not true in the totality of the

circumstances of Mr. Tam's case.   *Encarnacion* places substantial limitations on the "shelf life"

concept and, when those limitations are followed in this case, they point to the conclusion of

staleness.  Encarnacion reasons that in drug trafficking,

> Just as different kinds of produce will retain their freshness for varying periods,
> the *timeliness of probable cause is context-dependent and will vary both with the
> nature of the information itself and with the nature of the suspected offense.*
> Thus, when evaluating a claim of staleness, we do not measure the timeliness of
> information simply by counting the number of days that have elapsed.  Instead,
> *we must assess the nature of the information, the nature and characteristics of the
> suspected criminal activity, and the likely endurance of the information.* Facts
> regarding an amorphous drug-trafficking enterprise, in which large-scale
> transactions may take weeks or months to mature, normally will have a longer
> *shelf life*. This *shelf life* sometimes may be extended when the application
> describes an ongoing pattern of conduct in the drug-trafficking arena, because the
> *probable cause determination will not hinge on discrete pieces of standalone
> evidence but, rather, on the totality of the circumstances*.  [emphasis added,
> citations and quotes omitted]

*Encarnacion*, *supra* at 497-498.

      Any shelf-life argument the government makes must fail in Mr. Tam's case.  No matter

what the product is - fresh vegetables or canned soup - its shelf life ends on the product's

expiration date.  If the product comes to the shelf shortly before its expiration date, the time in

---

[10] *Encarnacion, supra* at 498.

which it can be sold will be relatively short.   Here, regardless of the expectation that the shelf life of probable cause is *normally* extended, the circumstances of this case atypical of a drug investigation; *the nature of the information, the nature and characteristics of the suspected criminal activity, and the likely endurance of the information* demonstrate staleness.

The totality of the circumstances of this case led the opposite conclusion that a neutral and detached magistrate would have drawn from the application in the *Encarnacion* case. Nothing in *Encarnacion* led to the conclusion that drug distribution had ceased.  Here, the record is filled with facts that point the other way.

The information in the Callahan Affidavit tends to show that the activities of the alleged conspiracy had ceased by the time of the wiretap application on March 3, 2021.  Normally in a wiretap investigation, targets are allowed to remain at large so that they do not become suspicious that they are under investigation and to allow agents to collect evidence.  That way, agents learn "the identities and locations of accomplices, aiders and abettors, co- conspirators, and participant in the TARGET OFFENSES" as described in the Callahan Affidavit's boilerplate explanation of necessity at ¶¶86 & 87.  Here, however, the intercession of state law enforcement apparently disrupted the federal drug investigation and caused the targeted persons to stop.  The principal investigative targets, Henry Vuong, Marcus Leyden, Robert Ostrander, James Colamaria, Vincent Duong, Daniel McLaughlin and Amanda Nolan (seven of the ten targets listed in Callahan Affidavit,  ¶6) were arrested on state charges involving guns and methamphetamine and detained at varying times.  Tam and the others would all have known or reasonably suspected that they were investigative targets.  Tam certainly knew of their arrests, as recorded jail calls from Suffolk and Billerica showed.  Callahan Affidavit, ¶¶61, 63 & 67.

Again, in contrast what *normally* occurs in a drug case, Mr. Tam appears to have ceased alleged drug activity and repeatedly tried to detox between October 2020 and March.  (Unlike defendants in *Encarnacion,* the targeted persons were user-dealers, driven by addiction instead of profit motive.  There is direct evidence of cessation of motive for stopping alleged distribution.  Tam told Vuong in the October 4, 2020, recorded jail call that he, Tam, had "retired".  In fact, Tam struggled with addiction and, as part of that effort, appears not to have been involved in packages from San Jose for four months, from November 7, 2020, until days after the March 4, 2021 start of interception.  There are no DEA-6's and no allegation in the affidavit concerning deliveries observed on the pole camera outside Mr. Tam's front door in Allston for the period from Leyden's October arrest or after the November 6 delivery to Vuong in Canton until after the March 3, 2021, warrant application.  Moreover, changes in the circumstances that had facilitated the alleged distribution scheme pointed to a cessation in activity by the time of the application.  Tam's termination of employment, for instance, denied him the cover of making sales from the Midas shop.  As DEA surveillance was frustrated by an inability to distinguish legitimate Midas customers from illegal drug purchasers (Callahan Affidavit, ¶128), so would Tam have lost his alleged ability to sell drugs covertly.  When viewed in the context of attempted recovery from addiction and the lack of evidence of deliveries from California, the loss of the Midas storefront would tend to show that distribution had stopped and not moved elsewhere as the Callahan Affidavit's statement of necessity implies (¶128).

POINT III:
*FRANKS* HEARING FOR
RECKLESS OMISSIONS

While an affidavit supporting a search warrant is presumptively valid, defendant may rebut this presumption and challenge the veracity of the affidavit.  *United States v. McLellan*,

792 F.3d 200 (1st Cir. 2015) (omission of "nomadic" habits of child pornography defendant not necessary to finding of probable cause) citing *Franks v. Delaware*, 438 US 154, 171 (1978).   To obtain a *Franks* hearing for a reckless omission, defendant's showing must pass a two-part test. The defendant must show (1) that an omission in the affidavit was made knowingly and intentionally or with reckless disregard for the truth and (2) that the omission was necessary to the finding of probable cause.  *McLellan, supra.*  As to the latter, defendant must establish that the inclusion of the omitted information would have led to a negative finding by the magistrate on probable cause. *Id.*

The Callahan Affidavit is facially insufficient because it fails to show that the target offenses were being committed in the four months before issuance of the warrant, because the principal investigative subjects had been arrested and intermittently detained, because Tam was in recovery and appeared inactive and because of the other changes in the totality of the circumstances in the critical period before the March 3, 2021 intercept order issued (e.g., Tam fired from Midas shop).  Nonetheless, should the Court have doubts about the defendant's showing on staleness, Mr. Tam is still entitled to a *Franks* hearing because the Callahan Affidavit recklessly omits" (1) that Tam was attempting to get clean and may have ceased alleged distribution activities; and (2) that the investigation of the alleged conspiracy had stopped in the four months prior to making application for the wiretap, e.g., lapsed tracking warrants, cessation of surveillance.  The gap in reporting on the activities is not readily apparent and the chronology of the investigation is partly obscured.  Had the Callahan Affidavit mentioned the months-long cessation of location monitoring and surveillance and the consequent lack of evidence of deliveries and combined it with evidence about Tam's apparent withdrawal from the conspiracy, a neutral magistrate would have concluded that no evidence of the target offenses

was to be gained for tapping Mr. Tam's phones.  Omission of these two facts tipped the balance of reckless omission and led to a finding of probable cause on an incomplete statement of facts.

The failure to inform the court of a lack of evidence of four months of ongoing criminal activity and that Mr. Tam was detoxing would have called the propriety of the wiretap into question.  Nothing in the Callahan Affidavit says the investigation had ceased and there is no mention of Mr. Tam's attempting to get clean.  Had these facts been reported to the court in the application in the totality of the circumstances (e.g., Tam no longer at the Midas shop and living at home with his wife, alleged coconspirators arrested and on bail or detained), the issuing court would not have found probable cause to believe that a wire on Mr. Tam would produce evidence of commission of the target offenses.  Probable cause is a two-part test in determining a wiretap application; a warrant is based on probable cause only when "the affidavit upon which a warrant is founded demonstrates in some trustworthy fashion the likelihood that an offense has been committed and that there is sound reason to believe that a particular search will turn up evidence of it."  *United States v. McLellan*, *supra* at 208-09 citing *United States v. Chiaradio*, 684 F.3d 265, 279 (1st Cir.2012).

One area of concern about the sufficiency of probable cause is SOI-2's alleged statements about Mr. Tam buying presumably a retail quantity of drugs (itself improbable) from SOI-2 and showing SOI-2 a gun in January 2021.  SOI-2's Callahan Affidavit, ¶¶81 - 83.  SOI-2's December 6, 2021, written statement (Ex. B)[11] indirectly attacks the connective tissue of the Callahan Affidavit for the period that the investigation stopped.  SOI-2 denies having made any statement before or after his arrest.  While the written statement does not speak to contact with

---

[11] The defense connects SOI-2 to his identity by the phone number mentioned on the chart of alleged calls between SOI-2 and Mr. Tam

Mr. Tam, it clearly denies having made any statement in connection with his SOI-2's arrest as the affidavit alleges.

There are other concerning omissions in the Callahan Affidavit, though not necessarily directly implicating staleness. TFO's had recovered the DVR system and security camera recordings for the Midas shop in a November 6, 2020, trash search. Callahan Affidavit, ¶126. Omitted is that these DVRs contained the surveillance from inside the Midas shop for a considerable period and, yet, the affidavit at ¶112 claims necessity because a pole camera would not show activities indoors. Interestingly, there is no mention of observing criminal activity in the security video recordings. The Callahan Affidavit also claimed that the pole camera outside Tam's house "only allowed a view of the front door and the street was not visible." As DEA-s 6's for April 14 (USAO 000297) and April 30, 2021 (USAO 000318) showed, that the pole camera had an extensive view of the street and allowed extensive observations, even the collection of license plate numbers. See, fn. 6, *supra*.

POINT IV:
FAILURE TO MINIMIZE

The investigation has not discharged its duty to reasonably minimize calls that were clearly unrelated to criminal activity. Both the statute (§2518(5)) and the March 3, 2021, order require minimization. At a minimum, defendant seeks suppression of all calls with his family and his "wife" as an appropriate remedy for what appears to be the complete absence of minimization effort. There are over 7,000 calls on the wiretap. To the extent that no calls to a number were properly minimized, calls to that number should be suppressed.

By enacting the Title III, Congress sought to protect the privacy of wire and oral communications while, at the same time, authorizing the use of electronic surveillance evidence

obtained by law enforcement under specified conditions. *United States v. Lopez*, 300 F.3d 46, 51 (1st Cir. 2002) citing *Bartnicki v. Vopper*, 532 U.S. 514, 523 (2001).  In accordance with Congress's concern for preserving privacy, Title III makes the interception of electronic communications by law enforcement an extraordinary investigative technique; its use is to be distinctly the exception and not the rule. *Lopez, supra.*  Accordingly, the minimization terms of the May 3, 2021, wiretap order  requires that "*monitoring of conversations must immediately terminate* when it is determined that the conversation is unrelated to communications subject to interception under Chapter 119 of Title 18." USAO 001394, p. 7.  Communications outside the scope of the wiretap order must be minimized. 18 USC §2518(5).[12]  Agents' efforts to minimize must be objectively reasonable in light of the circumstances of the interception.  *Scott v. United States,* 436 US 128 (1978).

The communications from the wiretap may be suppressed where "the interception was not made in conformity with the order of authorization or approval." Id. § 2518(10)(a)(iii).  Nonetheless, wholesale suppression may be inappropriate. See *United States v. Gordon,* 871 F.3d 35, 47 (1st Cir. 2017)  ("A minimization violation often can be cured through a less draconian remedy: suppression of only those calls that the court determines should have been minimized.")  In this case, failure to minimize should be sanctioned categorically to exclude all unminimized calls for the sister, mother and wife.  In this Circuit, wholesale suppression of the wiretap is considered a "Draconian" remedy in most instances of failure to minimize, the usual remedy will be suppression of only those calls a court finds should have been minimized.  *United States v. Gordon, supra;* see, also *United States v. Pina-Nieves*, 575 F. Supp. 3d 270 (D.P.R.

---

[12] "*Every order and extension thereof shall contain a provision that* the authorization to intercept shall be executed as soon as practicable, *shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter*, and must terminate upon attainment of the authorized objective, or in any event in thirty days." [emphasis added]  §2518(5).

2021) (eight calls from 25 seconds to two minutes and six seconds from defendant to his counsel).

The calls between TT-1 and Mr. Tam's sister and mother should have been but were not minimized. As it appears from discovery, agents failed to minimize any of these 36 calls. The discovery does not indicate that any of Tam's family were criminally involved. The identity of Tam's sister was on a "family plan" account maintained by Mr. Tam's father and which included the phone numbers of Tam's father, sister and brother in addition to TT-1. The identity of family members should have been apparent from subscriber information provided by carriers to the investigation under the March 3, 2021, wiretap order. The 1st Search Warrant Affidavit's claim that the sister was a "UF" or unidentified female was not consistent with available information. The identity of Tam's mother should also have been clear to any reasonable listener. Most of the calls with Tam's mother, although in Cantonese, began with or contained English phrases like "Hi Mom" or "OK Mom" so the identity of the participants would have been apparent. There are 28 unminimized Cantonese language recorded calls between Tam and his mother from 1.5 to 19.5 minutes in length with only five of these under two minutes.

Whether the government fails adequately to minimize intercepted conversations "depend[s] on the facts and circumstances of each case." *United States v. Gordon,* 871 F.3d supra at 47 citing *Scott v. United States*, 436 U.S. 128, 140 (1978). To determine whether the government minimized interceptions sufficiently, the Court must conduct "an objective assessment in light of the facts and circumstances known to the government at the relevant points in time." *United States v. London*, 66 F.3d 1227, 1236 (1st Cir. 1995). Minimization is "analyzed on a case-by-case basis looking to the reasonableness of the interceptor's conduct." *United States v. López*, Case No. 99-079, 2000 U.S. Dist. LEXIS 8060 at *21 (D. Me. Apr. 28,

2000) (citing *United States v. Hoffman*, 832 F.2d 1299, 1308 (1st Cir. 1987). In evaluating the government's compliance with minimization requirements, a reviewing court must "look at several factors, including: 1) the nature and complexity of the suspected crimes; 2) the thoroughness of the government's precautions to bring about minimization; and 3) the degree of judicial supervision over the surveillance process." *Gordon, supra* at 48 citing Lopez, i*nfra*.

Nature and Complexity. In this case, the meaning and context of communications about alleged target offenses was obvious; minimization decisions should have been obvious and prompt. The target offense was a comparatively simple alleged amphetamine distribution conspiracy of buying from suppliers in California and having the drug shipped by US Postal Service or Fed Ex to one of two Boston-area addresses and using and reselling some of the drug. Communications were not encoded and words tended to have plain or obvious meaning, thus enabling a quick and accurate determination on minimization. The parties usually referred to the drug by a street name or other obvious terminology - they even announced the arrival of "drugs!" in some text messages. The communications usually did not attempt to conceal times or places. The conspiracy was not particularly extensive nor was its existence well concealed. The drugs were vacuum packed by the seller and mailed or sent through a Post Office or a Fed Ex drop and then their tracking was discussed in texts and calls. The sealing of the packaging did not involve any sophisticated attempt to avoid detection like inclusion with other goods or to conceal the odor with other strong-smelling substances. There was no scheme or consistent plan to conceal the addressee other than occasionally using the name of an actual Midas employee - though here, too, most packages were shipped to Leyden's real name.

Thoroughness of government's minimization. None of the calls referred to above on TT-1 or TT-2 to Mr. Tam's sister, mother or "wife" appear to have been minimized. This may owe

to the software package provided with discovery, but, at a minimum, the calls listed in the "FACTS" section above, subsection "G." have not been minimized because they were recorded in full.

Degree of judicial supervision.  Counsel has not received in discovery any interim reports to the issuing court or a copy of the minimization memorandum given to the wire room.  At this point, counsel awaits a response to his informal request.  The March 3, 2021, wiretap order requires that contracted wire room employees work under the supervision of the DEA.  USAO 001349.

The statute imposes a standard of "practicable" as opposed to "immediate" minimization of foreign language communications.  §2518(5).  The Cantonese language communications between TT-1 and the number for Mr. Tam's mother have been recorded in their entirety for a period of over seven weeks.  Even on a standard of "practicability" where a few of calls may have been monitored before the engagement of an interpreter, the wire room was obligated to but did not obtain one for the Cantonese calls.   This is also contrary the March 3rd, 2021, wiretap order, which provides that if "an expert in . . . foreign language is not reasonably available during the intercept period, minimization may be accomplished as soon as practicable after such interception."  See, *United States v. David*, 940 F.2d 722, 730 (1st Cir. 1991).  With no minimization of TT-1 for the mother or the sister listed in above in "FACTS, G.", all these calls should be suppressed.

While the calls with Mr. Tam's mother are not believed to be incriminating, they are corroborating evidence that agents did not follow the minimization directives of §2518(5) to minimize, to immediately minimize non-targeted calls in English and to minimize calls in a

foreign language or code.[13] Moreover, where the contents are unknown, these calls may contain incriminating evidence when offered in conjunction with other evidence.

CONCLUSION

For the reasons set forth above, this motion should be granted.

Dated: April 28, 2023                    Respectfully submitted,
                                          Harry K. Tam, defendant
                                          By his counsel,
                                          Kevin L. Barron
                                          Kevin L. Barron, Esq.
                                          P.O. Box 290533
                                          Charlestown, MA 02129
                                          (617) 407-6837

CERTIFICATE OF SERVICE

Counsel certifies that he has caused a true copy of this document together with its exhibits to be served today on the attorneys for all the parties through the CM/ECF system of this District as set forth in the Notice of Electronic Filing and that no party requires service by other means.

                                          Kevin L. Barron

---

[13] The USAO's minimization memorandum and its interim reports to the issuing court (Stearns, J.) were not provided in discovery.  Counsel has requested these documents informally awaits production.