UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Criminal No. 21-10350-LTS |
| | ) | |
| HARRY TAM, | ) | |
| Defendant. | ) | |

ORDER ON MOTIONS TO SUPPRESS (DOC. NOS. 284, 288, 290, 385)

June 30, 2023

SOROKIN, J.

Harry Tam has filed three motions to suppress evidence he anticipates the government might adduce at trial. One challenges statements Tam made during an interaction with Task Force Officers ("TFOs") of the U.S. Drug Enforcement Agency on May 3, 2021. Doc. No. 284.[1] Another challenges the wiretap authorized by Judge Stearns. Doc. No. 290. The third concerns the evidence seized at Tam's home when a search warrant for that location was executed by law enforcement in May 2021. Doc. No. 288. The government has responded to each motion. Doc. Nos. 305, 326.[2] After a non-evidentiary hearing on the Motions to Suppress, Tam filed a supplemental memo, Doc. No. 382, and later a Motion for an Evidentiary Hearing and for Leave

---

[1] Citations to "Doc. No. __ at __" reference items appearing on the court's electronic docketing system, and pincites are to the page numbers in the ECF header.
[2] The government first filed a "response" to Tam's Motion to Suppress Statement. Doc. No. 305. It then filed an omnibus memorandum opposing Tam's Motion to Suppress the Wiretap and Motion to Suppress the Search of the Premises. Doc. No. 326.

to File Reply. Doc. No. 385. For the reasons explained below, the Court finds no evidentiary

hearing is warranted, and Tam's motions are DENIED.

I.        PROCEDURAL BACKGROUND

A grand jury returned an eleven-count indictment against ten defendants. Doc. No. 1. The

Indictment charges Tam with Count One: Conspiracy to Distribute and to Possess with Intent to

Distribute 50 Grams or More of Methamphetamine, Count Six: Distribution of and Possession

with Intent to Distribute 50 Grams or More of Methamphetamine, Count Ten: Felon in

Possession of a Firearm and Ammunition, and Count Eleven: Possession of a Firearm with an

Obliterated Serial Number. Id. On December 16, 2021, Attorney Christopher Malcolm appeared

as retained counsel on behalf of Tam at the arraignment. Doc. No. 26. Malcolm continued to

represent Tam thereafter. Ultimately, Malcolm filed a motion to suppress on behalf of Tam, Doc.

No. 246, and the government filed a motion to disqualify Malcolm due to a conflict of

interest. Doc. No. 231. After briefing and a hearing, the Court disqualified Malcolm. Doc. No.

253. Tam requested the appointment of new counsel. Doc. No. 257. The Court allowed that

request and appointed Attorney Barron from the CJA panel. Id. After due consideration, Barron

withdrew the motion to suppress filed by Malcolm in favor of filing three new motions to

suppress. Doc. Nos. 263, 284, 288, 290. The Court terminated the motion filed by Malcolm. Doc.

No. 264. The motions filed by Attorney Barron are now ripe. Tam's trial along with one of the

two remaining co-defendants is scheduled for July 17, 2023. Doc. Nos. 297, 361.

II.       DISCUSSION

A.    Statements

In the first motion, Tam asks the Court to suppress the statements he made to law

enforcement after what he calls an "extensive interrogation." Doc. No. 824 at 2. The Court need

not linger over Tam's challenge, as the government has represented that it "has no intention of using the Defendant's statements made on May 3, 2021, at trial or for any other purpose during the pendency of this case." Doc. No. 305. Given the government's position, Tam's Motion to Suppress Statements, Doc. No. 284, is DENIED AS MOOT. This ruling is without prejudice to Tam reviving his challenge in the event the government seeks to use any of the challenged statements.

## B.  Wiretap

Next, Tam moves to suppress evidence acquired from phone calls intercepted pursuant to an initial order later renewed: the initial March 3, 2021 order authorized interception of wire and electronic communications over target telephones 1 and 2 ("TT-1" and "TT-2") for thirty days, and the renewal issued on April 2, 2021 authorized another thirty days of interception of TT-1. Doc. Nos. 327-1, 327-2. The orders are properly subject to this Court's review on a motion to suppress. See United States v. Santana-Dones, 920 F.3d 70, 75 (1st Cir. 2019). In evaluating the Motion, the Court must determine if the "facts set forth in the application were minimally adequate to support the determination that was made." Id.; see also United States v. Nelson-Rodriguez, 319 F.3d 12, 32 (1st Cir. 2003). Tam makes two arguments for suppression: staleness and minimization. The Court addresses each in turn.

### 1.  *Staleness*

Tam first argues that the information contained in the wiretap affidavit was stale and should be suppressed. In evaluating staleness, the Court "must assess the nature of the information, the nature and characteristics of the suspected criminal activity, and the likely endurance of the information." United States v. Encarnacion, 26 F.4th 490, 497-98 (1st Cir. 2022).

Fact specific context and evidence here matters. The affidavit establishes ample probable cause to believe Tam was participating in a nationwide drug distribution conspiracy in 2020. The affidavit plainly shows multiple packages sent from California to Tam or his co-conspirators in Massachusetts. Doc. No. 327-2 at 19-27. Most of the packages went to Midas Auto Body Shop ("Midas") in Brookline where Tam worked as the manager. Id. at 23-27. Agents intercepted one package, determined it contained methamphetamine, and communicated with Tam (the identified recipient), who had the tracking number for the package. Id. at 19-22. The affidavit also set forth other evidence of the source of the methamphetamine, co-conspirators working with Tam in the receipt of the methamphetamine from California, and the distribution of it in Massachusetts. Id. at 50-62. Finally, the affidavit established probable cause that Tam used TT-1 to conduct these activities. Id. at 20-51. Unsurprisingly, Tam does not contest that the affidavit established probable cause that he used TT-1 to further his participation in a drug distribution conspiracy in violation of federal law.

Rather, Tam contends that the probable cause evidence arose from activities between January and November 2020, and that this evidence was stale at the time of the interception order on March 3, 2021. Tam's contention misses the mark for several reasons.

First, Tam argues that the absence of evidence of other drug shipments after November 2020 renders the application stale. Not so, in this particular case. As the First Circuit recently explained, large scale drug conspiracies "normally will have a longer shelf life" than other criminal activity. Encarnacion, 26 F.4th at 497 (citing United States v. Schaefer, 87 F.3d 562, 568 (1st Cir. 1996) (observing that longer-running nature of drug-trafficking conspiracies makes it more likely that "a datum from the seemingly distant past will be relevant to a current investigation")); see also United States v. Nocella, 849 F.2d 33, 40 (1st Cir. 1988) (noting that

"drug trafficking, if unchecked, is apt to persist over relatively long periods of time" so that the shelf life of facts supporting probable cause may be longer). This is exactly what the affidavit describes—a multi-month conspiracy involving large quantities of drugs and involving many people in Massachusetts, not to mention distributors in California and payments to Mexican cartels. The evidence presented was more than "minimally adequate," not only to establish probable cause in November, but also three to four months later on March 2nd, given the duration, nature, and scope of the conspiracy.

Second, Tam attempts to bolster the foregoing staleness argument by pointing out Midas fired him in November. He also notes that despite ample opportunity to observe Tam's home in the months after his termination, including with a pole camera installed by law enforcement, the affidavit presented no evidence of shipments there. But the evidence also supports a different reasonable inference: Tam with others searched for or located another location to receive the packages or otherwise continue to distribute drugs obtained in other ways. After agents seized a package sent via the United States Postal Service on July 29, 2020, evidence in the affidavit shows the targets recast their operations to send packages via FedEx. Doc. No. 327-2 at 20. This change evinces a shift in conspiracy tactics in response to actions beyond their control (the seizure). The inference that the same occurred after Tam's termination is reasonable. Nothing in the affidavit suggests the Midas location was an indispensable piece of the conspiracy. That no packages appeared at Tam's home is unsurprising: nothing suggests they ever appeared there by any sort of mail service. Indeed, the difficulty in identifying how the conspiracy evolved supported the necessity determination rather than undermining the probable cause finding.

Third, the affidavit provides evidence establishing probable cause of other ongoing criminal activity, including the possession of firearms and distribution of firearms or "ghost

guns." Doc. No. 327-2 at 30. The affidavit also supplies evidence of a substantial criminal conspiracy. Id. at 30 (describing identified witness reporting Tam sold "ghost guns" made by a friend, as well as methamphetamine and false identification cards and licenses); id at 33 (describing ammunition, "ghost gun," and controlled substances in possession of alleged co-conspirator Vuong upon his arrest); id. at 39 (noting alleged co-conspirator Leyden in possession of a "ghost gun" as well as various controlled substances upon his arrest); id. at 40 (describing seizure of computers, external drives, and laminating machine). The scope and range of these various ongoing, jointly undertaken criminal activities supports and establishes the probable cause finding as of March 3, 2021, even though these reported events occurred in 2020.

Fourth, Tam points to his statement that he "retired." Tam told Voung that he (Tam) was "retired" on October 4, 2020, in a jailhouse recorded call while Vuong was in jail. Doc. No. 290 at 5.[3] Yet, just days later, on both October 7th and October 24th, Tam was observed engaging in conduct reasonably interpreted as the distribution of controlled substances. Doc. No. 327-2 at 38, 57. In addition, the affidavit identifies multiple packages sent to Midas which, with the surrounding evidence in the affidavit, comfortably establishes the shipments contained controlled substances, as well as Tam's knowledge and participation in the distribution of these shipped drugs well after the October 4th statement. Id. at 25-26. In light of this evidence, the affidavit easily establishes minimally adequate probable cause as of March 3, 2021. Standing alone, this stray comment hardly suffices to defeat the other evidence, especially in the face of subsequent contrary evidence presented in the affidavit.

Fifth, the evidence suggests that Tam continued to sell drugs after his firing and "retirement." The affidavit notes that on January 8, 2021, Tam visited SOI-1, along with an

---

[3] For present purposes, only, the Court accepts Tam's interpretation of the call.

unidentified female companion, and stayed at SOI-1's home for thirty minutes. Doc. No. 327-2 at 43. The two arrived in an SUV jointly registered to Tam and his wife. Id. Police, based on a tip of drug distribution, observed Tam arrive, enter the apartment building, and leave thirty minutes later. Id. After, law enforcement spoke to SOI-1, he (SOI-1) reported that Tam came to collect drug proceeds. Id. Telephone toll records establish multiple phone contacts on this day between TT-2 and SOI-1. Id. Still, Tam insists that his thirty-minute stop is inconsistent with Tam visiting SOI-1 to pick up drug money, and is instead consistent with Tam "using drugs on the premises." Doc. No. 290 at 8. Thirty minutes does not preclude collecting drug proceeds. At issue is a minimally adequate probable cause determination. The inference presented by the affidavit, supported by a statement from SOI-1 to law enforcement, as well as phone records showing contemporaneous calls between the two phones suffice for the probable cause determination.[4]

Sixth, on January 21, 2021, Boston Police arrested SOI-2. The affidavit reports SOI-2 stated he previously purchased meth from an Asian male from California known as "Harry" driving a white Lexus. Doc. No. 327-2 at 45. Those descriptive features fit Tam. Tam is an Asian male from California known as Harry who then drove a white Lexus. Id. The affidavit also reported SOI-2 saw "Harry" with a ghost gun, something other individuals also reported about two other targets. Id. Finally, a toll analysis of SOI-2's phone showed it having multiple contacts with both TT-1 and TT-2 in the days before the arrest. Id. at 46. These facts, taken along with the affidavit as a whole, reasonably support an inference of ongoing drug distribution by Tam.

---

[4] At the hearing, Tam's counsel reported that TT-2 was registered in the name of Defendant Duong's father. Duong was not a named target in the first affidavit. See Doc. No. 327-2 at 6. These facts, had they been revealed in the affidavit, would not detract from the probable cause determination, nor defeat or undermine the significance of TT-2 in the affidavit, either for the purpose of concluding TT-2 was being used to further drug distribution, or that Tam was using it.

Finally, Tam complains that by the time of the order, law enforcement had arrested many of the other targets, and DEA had ceased various investigative activities. But Tam was not arrested. The question presented is whether there was minimally adequate probable cause to believe Tam was using phones the affidavit tied to Tam to further his participation in a wide-ranging drug conspiracy. That DEA ceased various investigative activities does not support, at least on this record, the conclusion that DEA found that Tam had withdrawn from the conspiracy. There are a myriad of reasons why DEA would continue, change, or stop particular investigative activities, virtually all of which have no relationship whatsoever to the probable cause determinations underlying the wiretap order. In fact, the affidavit notes that the investigation is ongoing, further rebutting Tam's argument that the investigation into the conspiracy ceased. See Doc. No. 327-2 at 73 ("[T]his Affidavit … reveals an ongoing investigation . . . .").

Even considering all of the foregoing challenges collectively, the Court concludes the government's affidavit establishes a 'minimally adequate' showing of probable cause for at least four reasons: (1) all the reasons noted above; (2) collectively the evidence shows Tam's ongoing participation in multiple jointly undertaken criminal activities primarily focused on drug distribution, which operated at a significant level (e.g., the packages), and continued into 2021 close in time to the March 3, 2021 wiretap order; (3) the nexus of guns to the distribution, including the report that in January 2021 Tam was distributing drugs while armed, supports the conclusion of a significant drug distribution operation, as guns are much more associated with large rather than small time retail drug distribution or mere drug use; and (4) Tam's participation in this conspiracy in the absence of withdrawal (and there is no evidence of withdrawal). See United States v. Leoner-Aguirre, 939 F.3d 310, 318 (1st Cir. 2019) (finding that to withdraw

from a conspiracy, "a conspirator must act affirmatively either to defeat or disavow the purposes of the conspiracy" and explaining that "a full confession or communication of abandonment to one's co-conspirators are typical ways for a defendant to show withdrawal"). Tam's conduct may have ebbed and flowed over the period in question but the evidence of his participation was not stale.[5] Accordingly, suppression of the evidence on staleness grounds is unwarranted.

2. *Minimization*

In the memorandum supporting his motion, Tam advances a series of challenges to the wiretap's minimization procedures, none of which merit suppression. The Court will address each in turn. Title III instructs monitors to minimize irrelevant calls. See 18 U.S.C. § 2518 (declaring that monitoring must "be conducted in such a way as to minimize the interception of communications not otherwise subject to interception"); see also Scott v. United States, 436 U.S. 128, 140 (1978) (explaining that Title III "instructs the agents to conduct the surveillance in such a manner as to minimize the interception of [irrelevant] conversations"). Consistent with this admonition, the initial wiretap order requires minimization, specifically that the "[m]onitoring of conversations must immediately terminate when it is determined that the conversation is unrelated to conversations subject to interception." Doc. No. 327-1 at 7. Of course, "if the conversation is minimized, the monitoring agent may spot-check to ensure that the conversation has not turned to criminal matters." Id. Interception must be "suspended immediately when it is determined through voice identification, physical surveillance, or otherwise, that none of the named interceptees or their confederates, when identified, are participants in the conversation." Id.

---

[5] Tam does not make the separate argument that even if the Court properly issued the wiretap order on March 3, 2021, it should not have reissued the wiretap order on April 2, 2021. Thus, the Court does not consider that issue.

Tam contends that the government violated the minimization requirement for calls between himself and his sister. Tam advances three theories for suppression. First, he contends that the first two intercepted calls with his sister established a "pattern" of non-criminal discussion which should have prevented the government from listening to future calls between them. Next, he complains that the government's alleged practice of recording calls that should be minimized violates the statute, spoils the wiretap, and requires the wholesale suppression of all of the intercepted calls. Third, he contends the government minimized insufficiently.

Tam's contention that the first two conversations between him and his sister were non-criminal in nature, thereby precluding the government from listening further to any conversations between Tam and his sister, Doc. No. 290 at 13, is simply incorrect. The government is entitled to periodically check in on non-criminal conversations to ascertain whether the conversations have moved into topics not subject to minimization. See United States v. Gordon, 871 F.3d 35, 47 (1st. Cir. 2017); see also Doc. No. 327-2 at 69 ("If a conversation has been minimized, the monitoring agents will spot check to ensure that the conversation has not turned to criminal matters."). Indeed, that is exactly what the wiretap order provided. Moreover, two phone calls do not establish a "pattern." The order plainly entitled the monitors to continue to listen and to intercept Tam's conversations with his sister to the extent authorized. Thus, the Court rejects Tam's argument that the government could not continue to monitor conversations between Tam and his sister. Regarding the particular incriminating call with his sister on May 2, 2021, Tam concedes the incriminating statement occurred "early" in the call, perhaps at the thirty second mark, and certainly within the first two minutes. There was no violation of any minimization requirements as to that call. The Court rejects the request to suppress that call.

Second, at the hearing on the Motions to Suppress, Tam's counsel noted that there was at least one call[6] that the government deemed "minimized" in the line sheets, but that, according to defense counsel, was recorded in its entirety. In response, the AUSA informed the Court that the government recorded every phone call completely and that minimization in this case merely meant that the monitors stopped listening to the minimized calls. Tam filed a post-hearing memorandum urging the Court to suppress all of the intercepted calls on the grounds that the government, by recording the entirety of minimized calls, grossly violated 18 U.S.C. § 2518. See United States v. Lopez, 106 F. Supp. 2d 92, *95 n.3 (D. Me. 2000) ("Minimization is the process by which intercepted telephone calls that do not pertain to the criminal investigation are not recorded or listened to for any longer than necessary." (emphasis added)); see also United States v. Renzi, 722 F. Supp. 2d 1100, 1128 (D. Ariz. 2010) ("Automatically recording everything, even where that is followed by a post-interception minimization protocol, virtually guarantee[s] the interception of communications the government should not have seized."); United States v. Simels, No. 08-CR-640 (JG), 2009 WL 1924746, at *9 (E.D.N.Y. July 2, 2009) ("The post-interception minimization may have closed the barn door, but the horse was already gone."). Given the clarity of the law—that the government may not record what is minimized—and the seeming clarity of the facts in light of the statements by the AUSA at the hearing, the Court required the government to file a reply brief addressing "(1) whether during the wiretap, the government recorded some or all of what the Court has defined as the 'minimized portion'[7] of phone calls as well as the circumstances resulting in these recordings; (2) whether the statute or

---

[6] Defense counsel was referring to the April 24th call between Tam and his sister entitled "session 4403" lasting approximately 23 minutes. Doc. No. 356.

[7] In the order, the Court defined the "minimized portion" to mean "the portion of such a call not listened to." Doc. No. 383.

the order authorize the recording of the 'minimized portion' of phone calls, and (3) if the government recorded the 'minimized portion' of phone calls without authority under the statute, order, or both what is the appropriate remedy, if any." Doc. No. 383. In the government's response, it reported that post-hearing it reviewed the issue carefully in consultation with both the DEA agents running the wiretap and the wire room supervisors. Doc. No. 384. The government represented to the Court that it had <u>not</u> recorded the minimized portion of phone calls. Doc. No. 384. It supported this statement with an affidavit. <u>Id.</u> In short, the government candidly admitted that it was "incorrect at the time of the non-evidentiary hearing," and that, in reality, the "law enforcement agents did not record any portion of what the Court has defined as the 'minimized' portion of the phone calls." <u>Id.</u> at 4-5. The government also explained why the recordings of the intercepted portion of calls that had been minimized may have seemed to be complete recordings of an entire phone call. Specifically, DEA Task Force Officer Amie Le, stated in the affidavit that the "23 minute highly private conversation" that defense counsel listened to was, in fact, minimized. Doc. No. 384-1 at 3-4. TFO Le explained that "the listener using the reviewing software would not hear any clear audio gap" because "the call playback will play the captured content without delay." <u>Id.</u> at 2-3. The software used by the government compressed together the recorded sections of a call into one recording with no audio gaps for the minimized unrecorded portions. <u>Id.</u>

After the government made its supplemental filing in response to the Court's order, Doc. No. 384, Tam filed a further response, Doc. No. 385, disputing the agent's representation that the calls were not recorded in their entirety, and pointing the Court to three calls which he claimed

supported this theory.[8] The Court ordered the government to submit these recordings and the line

sheets. Doc. No. 386. The government provided the recordings, line sheets, and line session

documentation for each of the recordings. Doc. No. 387. The Court then listened to the

recordings and compared them against the line sheets and line session documentation.

After listening to the three calls cited by defense counsel, as well as reading the line

sheets and line session documentation, the Court finds that the government did not record the

entirety of calls that it minimized. Put another way, the Court rejects the assertion of defense

counsel that though the government labeled certain calls minimized (and may have stopped

listening), the government proceeded to record the whole call. Though subtle, the Court hears a

brief interruption and change in conversation at the point in the recordings where the government

says it minimized (i.e. stopped listening and stopped recording) the call. The government's

assertion is corroborated by the computer printouts they filed which show computer generated

reports of minimization on and off at specific times in specific calls. Doc. No. 387-3.[9]

Additionally, when the Court adds together the recorded time and the time not recorded due to

minimization according to the submission from the government, the total approximates closely to

the total call time. This further supports the government's position that it did not record the parts

of the conversation deemed minimized. In sum, the Court finds the record establishes that the

---

[8] Tam urged the Court to listen to TT-1 0023 session 4403 and TT-1 6006 session 13. He also
represented that the "line sheets' reporting of the duration of the communication is not accurate
and not an indication that the government conducted minimization," citing to TT-1 6006 session
775 as an example. Doc. No. 385 at n. 2.

[9] The government could have simplified resolution of this challenge had it comprehensively
addressed the minimization challenge including by responding to Tam's minimization argument
in its initial opposition or correlating the time clock stamps shown on its minimization
submission with the time stamps on the audio recordings which do not list clock time nor
correlate simply to clock time.

government did not record the portions of conversations it minimized, nor did the government record every single call in the call's entirety. It complied with the interception order.[10]

One more issue remains. Tam has also claimed that the government intercepted too much: that it did not reasonably or properly minimize its interceptions. "As a general matter, whether the government fails adequately to minimize intercepted conversations 'depend[s] on the facts and circumstances of each case.'" Gordon, 871 F.3d at 48 (quoting Scott, 436 U.S. at 140).[11] The First Circuit has identified three factors a reviewing court "must" examine. Gordon, 435 F.3d at 48. The Court addresses each in turn. The first is the "nature and complexity of the suspected crimes." Id. Here, the order identified a number of target offenses including a months long large scale national drug distribution conspiracy involving multiple participants with some apparent ties to Mexico. In a wiretap interception aimed at this type of alleged offense, "more context is needed to determine whether a conversation is related to the suspected crimes." Id.

Next, the order itself required reasonable minimization. The evidence before the Court demonstrates the government prepared minimization instructions and procedures for the

---

[10] The calls between Tam and his mother are of a different nature. They spoke in Cantonese during those calls. The statute permits the government to intercept all of those calls given the difficulties of translation. See 18 U.S.C. § 2518(5). Here the government never translated the calls and does not intend to use them at all.

[11] The First Circuit has not addressed expressly who bears the burden of showing adequate minimization procedures. Other circuits have determined that after this issue of minimization has been raised, the government bears the prima facie burden to show that minimization was reasonable. See United States v. Rivera, 527 F.3d 891, 904 (9th Cir. 2008). If such a showing is made, the burden shifts to the defendant to demonstrate that the minimization was unreasonable. See United States v. Yarbrough, 527 F.3d 1092, 1098 (10th Cir. 2008); United States v. Armocida, 515 F.2d 29, 45 (3rd Cir. 1975); cf. United States v. Lopez, No. 99–79–P–C., 2000 WL 761977, at *6 (D. Me. 2000) (collecting cases). Even if this burden shifting approach applies in the First Circuit, for the reasons stated in the text, the government has met its burden to make a prima facie showing and Tam has not met his burden to show "more effective alternative procedures for minimization which nevertheless would permit the government to achieve its objectives." Armocida, 515 F.2d at 45.

monitors, that the procedures required monitors to sign documentation establishing they had reviewed the instructions, that the interception software provided for one button or one click minimization (i.e. one click on the monitoring screen to stop listening and recording), and that the line sheets the government prepared documented minimization. Doc. No. 379-7, Doc. No. 384-1. These procedures largely follow those approved by the First Circuit in Gordon and satisfy the second of the three factor analysis described in Gordon. Finally, as to the third factor, the issuing judge required periodic monitoring reports. Doc. No. 327-1 at 12. Thus, the three factor analysis demonstrates reasonable minimization.

Moreover, Tam has not shown that the minimization was not reasonable or was not an "honest effort." United States v. Charles, 213 F.3d 10, 22 (1st Cir. 2000). In a second post-hearing filing styled as a Motion for Leave to File a Reply and Convene an Evidentiary Hearing, Doc. No. 385,[12] Tam identified a handful of calls arguably personal, non-criminal and non-evidentiary in nature, and further stated his counsel "is working on and would offer" a spreadsheet of more such calls. Doc. No. 385 at 2-3. The Court has considered this submission along with the assertion the government was not reasonably minimizing. The government has explained as to a handful of calls previously identified why it continued to intercept those identified calls. For example, a reference to drugs or a reference to a toolbox, both of which suggest discussion relating to illegal activity or storage of contraband. Doc. No. 384-1 at 3-4, Doc. No. 387 at 2. The Court is also not persuaded, given the filings and findings on the motion, that the calls counsel has identified as not minimized were actually not minimized. In several instances calls counsel labeled unminimized (meaning to counsel that the government recorded

---

[12] The Court notes that this Motion for Leave to File a Reply was itself a de facto reply as it contained several pages of argument. The Court treats it as such and has considered the arguments made therein.

the whole call despite saying the call was minimized) were in fact minimized.[13] This is particularly so when Tam has not submitted evidence in support of his contention. On the present record, Tam has not established anywhere near the showing required under United States v. Charles for any form of blanket suppression, nor is the brief identification of a handful of intercepted calls he deems required greater minimization sufficient under the totality of the circumstances noted herein to convene an evidentiary hearing as to the overarching reasonableness of the minimization procedures, most especially at this late date (as explained below). See 213 F.3d at 23. The Court of Appeals has long held that blanket suppression "should be reserved for the most 'egregious cases.'" See Gordon, 871 F.3d at 47 (citing United States v. Hoffman, 832 F.2d 1299, 1309 (1st Cir. 1987) (holding total suppression appropriate, if at all, in "a particularly horrendous case")). Blanket suppression is only appropriate where a Defendant shows a "taint upon the investigation as a whole sufficient to warrant [such] sweeping relief." Charles, 213 F.3d at 23 (quoting Hoffman, 832 F.2d at 1307). Defendant has failed to make a sufficient showing. To the extent that the government listened to and recorded more of Tam's conversation with his sister than was relevant to the investigation, i.e., that it should have minimized more of the call, such a violation, even if that is a violation (and the Court does not and need not make that determination), is insufficient to warrant suppression of anything other than portions of that call with Tam's sister. See Gordon, 871 F.3d at 47 ("A minimization violation often can be cured … [by] suppression of only those calls that the court determines should have been minimized."). The government does not intend to use that call, so suppression of it is moot.

---

[13] The Court casts no aspersions on the fine work of defense counsel. As noted above, the audio gaps are not necessarily crystal clear. Zealous defense counsel properly advanced the non-minimization argument.

There is still more. On June 29, 2023, Tam made another post-hearing filing, this time a Motion for Leave to File a Reply along with the Reply Tam seeks to file. Doc. No. 395. In this pleading, Tam makes several contentions. First, he argues that the government's assertion it did not record the minimized portion of phone calls "is false." Doc. 395-1 at 1. On this record, if anything is incorrect, it is Tam's contention. Tam filed the Motion to Suppress on May 3, 2023. Doc. No. 290. In the course of the litigation of this Motion, Tam has made filings on May 3rd, id., May 23rd, Doc. No. 312, June 9th, Doc. Nos. 355 and 356, June 12th, Doc. No. 359, June 15th, Doc. No. 372, June 20th, Doc. No. 380, June 28th, Doc. No. 385, and June 29th, Doc. No. 395, as well as two discovery letter requests on May 24th and May 25th, Doc. Nos. 319 and 322, and a June 19th Assented To Motion for Discovery, Doc. No. 374, which the Court promptly allowed the next day. Doc. No. 376. Along the way, the Court also authorized a second CJA lawyer to represent Tam, Doc. Nos. 320 and 321, and held a non-evidentiary hearing on June 16, 2023. Doc. No. 373. Tam has had ample opportunity to prepare, to file, and to litigate his motion to suppress the wiretap. Though he continues to claim either the government recorded the entirety of every phone call or that the government recorded the portions of calls the government asserts it minimized, in the course of all of those filings over the course of almost two months he has submitted no evidence whatsoever of such an occurrence. All of the evidence is to the contrary. The Court has reviewed several of the calls submitted by the government at the Court's direction, which Tam vehemently contends the government did not minimize. Based on the Court's careful review of these specific calls, it is clear that the government did minimize the calls. The government stopped listening and recording just as it said it did. There simply is no basis (nor evidence) to suppress anything on this ground, nor is there any basis (or evidence) to convene an evidentiary hearing on this basis.

Next, Tam faults the government that the minimized "portions no longer exist to show what was actually cut out." Doc. No. 395-1 at 2. This is exactly what the law requires. Ordinarily, there should be no recording of what was minimized. The statute and the order each require the government to stop intercepting, i.e., both to stop listening and to stop recording conversations (or portions thereof) not properly intercepted. Of course, then, no recording exists of the minimized portion.

Next, Tam complains that many calls the government labels as pertinent "are not pertinent." Doc. No. 395-1 at 3. The Court rejects this argument for several reasons. Tam submits no evidence in support of the argument—no recordings, no line sheets, and no affidavit. Instead, he offers only counsel's brief combined one sentence summary/argument as to each of the thirteen calls listed in this section of the reply. In any event, contrary to Tam's contention, several of these calls appear pertinent[14] and obviously appropriate for interception including: a phone call regarding a flight to California (the source of much of the drugs distributed by the conspiracy under investigation), a call regarding an insurance claim for a damage to a vehicle (frequently conspirators employ and dispense with vehicles to evade detection), calls regarding credit cards and home security systems, both of which are topics that appear facially relevant to a

---

[14] The Court understands the "pertinent" or "non-pertinent" label attached to intercepted calls as something the government attaches to calls at a later or post-interception point of time, indicating based on a further review whether the government deems the call relevant to the investigation. While the interception of calls deemed non-pertinent may be a factor to consider in evaluating the interception procedures, especially in the case of large numbers of such calls, the mere existence of an intercepted, non-pertinent call does not necessarily suggest, let alone establish improper interception. For example, in this case, monitors might properly intercept a call discussing a flight to California in light of the evidence of California as a source of supply and Tam's personal connections to California. A later review might (or might not) result in deeming the call non-pertinent given other information known to investigators. See, e.g., Doc. No. 387 at 2. In this wiretap, the summary information provided by the government, Doc. No. 379, shows that most intercepted calls were deemed pertinent.

criminal investigation of this nature, and finally a plainly proper subject of interception—a call in which Tam states, per his own summary, he had ceased "all illegal activity for 'about a month already.'" Doc. No. 395-1 at 5. That last call is, of course an arguable confession to prior illegal activity. This summary Tam submits neither alone, nor in light of the totality of the circumstances, warrants wholesale suppression of the intercepted phone calls, nor an evidentiary hearing or further inquiry into the reasonableness of the implementation of the minimization protocols.

Next, Tam identifies fifteen calls he made to substance abuse rehabilitation treatment centers each of which he says identifies the center as a party to the call at the outset. Doc. No. 395-1 at 5-6. Tam says none of these calls reference the target offenses or target subjects nor, he says, could they reasonably be expected to do so. Again, Tam fails to submit the recordings, the line sheets, or an affidavit. As to these calls, Tam does not even identify the duration of the call. This is not evidence of a failure to implement reasonable minimization procedures. Discussions relating to Tam using drugs, or seeking or attending treatment may reasonably also involve discussion of drug use, drug distribution, and storage or preservation of contraband held in various locations as indeed occurred in the course of this very wiretap.

In summary, the government has demonstrated that it made reasonable, good faith efforts to minimize. Tam has not established that any failure to minimize prejudiced his rights, as he concedes the calls that should have been minimized were innocuous. See Gordon, 871 F.3d at 47 ("The absence of prejudice to Defendant may, in itself, warrant the denial of his motion to suppress."). For that reason, and for all the reasons explained above, the Court DENIES Tam's Motion to Suppress the Wiretap, Doc. No. 290, on minimization grounds.[15] The Court ALLOWS

---

[15] This ruling also applies to all other calls cited by Tam.

the Motion for Leave to File a Reply, Doc. No. 395, DENIES AS MOOT that much of the earlier

motion seeking leave to file a reply, Doc. No. 385, given that the Court has considered the reply

Tam filed at Doc. No. 395-1 as well as the argument set forth in Doc. No. 385, and DENIES that

much of the earlier motion seeking an evidentiary hearing. Doc. No. 385.

3.   *Franks* Hearing

Next, Tam contends that law enforcement omitted key details from the affidavit which

would materially change the issuing judge's decision. In order to receive a <u>Franks</u> hearing,

Defendant must show "(1) that a false statement or omission in the affidavit was made

knowingly and intentionally or with reckless disregard for the truth; and (2) the falsehood

or omission was necessary to the finding of probable cause." <u>United States v. Rigaud</u>, 684 F.3d

169, 173 (1st Cir. 2012); <u>see also</u> <u>Franks v. Delaware</u>, 438 U.S. 154, 171 (1978). As to the

foregoing points, Tam bears the burden to make "a substantial preliminary showing" to obtain

the hearing. <u>United States v. Graf</u>, 784 F.3d 1, 3 (1st Cir. 2015) (citing <u>Franks</u>, 438 U.S. at 170.

The Court addresses each of Tam's contentions in turn.

First, Tam complains the affidavit failed to disclose Tam was "in recovery" and

struggling with family tragedy (his son developed a serious medical condition) between

November 2020 and March 3, 2021. Neither fact constitutes an omission warranting a <u>Franks</u>

hearing. Tam has not established the government knew (or reasonably should have known) either

of these facts on March 3, 2021, or that either such fact bears on the probable cause

determination. Nothing in the affidavit suggests that drug use by Tam was a substantial factor in

causing the wide ranging criminal conduct, or that family considerations drove or would have

prevented his criminal activity.

Next, Tam complains the affidavit failed to disclose that many of the co-conspirators had been arrested and intermittently detained. Not so. The affidavit disclosed Vuong's arrest and subsequent detention. Doc. No. 327-2 at 56. It disclosed the same as to Leyden. Id. at 13. It also disclosed the arrests of Ostrander, id. at 15, and a supplier in California. Id. at 39. Relatedly, Tam says the affidavit did not disclose the absence of investigative or criminal activity between November 2020 and the March 3, 2021 wiretap order. This too is incorrect. The affidavit did disclose some criminal activity during that period as described above. In addition, the absence of activity was disclosed by the fact that nothing else was described as occurring in this period other than what appeared in the affidavit. Any reader of the affidavit, let alone an experienced federal judge, would understand that the affiant did not say, for example, he had evidence of shipments in February 2021 or had conducted other undisclosed investigative activities. Rather, the affiant presented the evidence he did have and stated he believed it established probable cause, leaving it to the judge to make an impartial determination. There was no omission here.

Next, Tam complains that the statement of SOI-2 from January 2021 was false. Almost a year later, in December 2021, SOI-2 denied making the statement attributed to him in the affidavit. Doc. No. 290-2. For several reasons, this fails to justify conducting a Franks hearing. The affiant reported what other officers told him SOI-2 said at the time of SOI-2's arrest in January 2021. Doc. 327-2 at 45. Even if SOI-2's December 2021 statement were sufficient to suggest a false statement, there is nothing to suggest the affiant had any inkling he was being misled by relying on the reports from Boston Police officers' reporting of SOI-2's statements. Putting that consideration to the side, in no event does SOI-2's "recantation" warrant a Franks hearing. The handwritten statement denies making "any comments" to "any officers or agents" and claims there "are many falsifications, lies and [untruths] listed in the [police] report." Doc.

No. 290-2. These conclusory, broad denials made long after the event, without any supporting corroboration or detail, are not the type of evidence that calls into question the affidavit. Also, the text of the statement says SOI-2 "attest[s]" and "swear[s]" that SOI-2 made no statements, but the document omits the conventional "under oath" type of language typically found in affidavits or declarations. For this reason alone, the Court determines the statement fails to meet Tam's burden of proof. The Court has other concerns as well. That the statement was secured by prior counsel whom the Court disqualified due to plain, troubling violations of the conflict rules gives further support to the Court's ruling.

Next, Tam complains that the affidavit omitted telling the judge of the recovery of videos from Midas' security cameras which depicted events within the shop while justifying the wiretap because of the shortcomings of surveillance in paragraph 112. The limitations of surveillance described in the affidavit are accurate with or without the recovered video. The recovered video was not an ongoing source of insight into events inside the Midas location, as nothing suggests law enforcement had ongoing access to the video. In any event, the omission was not material. The video, even if ongoing, would not have obviated the necessity for the wiretap, especially given Tam's termination from Midas.

Next, Tam complains of alleged reckless omissions and false reporting regarding call records. Specifically, Tam says the affidavit did "not give an accurate 'tolls analysis'" of the target telephones for February 2021, Doc. No. 356 at 7, asserting that the total number of calls and texts the affidavit attributes to TT-1 in paragraph 84 of the affidavit are incorrect. Id. Assuming without deciding the totals are, in fact, wrong, the totals are irrelevant. Paragraph 84 shows that TT-1 (Tam's phone) had a meaningful number of voice and text contacts with Ostrander's phone and Cabrera's phone. Doc. 327-2 at 47. These specific contacts support the

probable cause determination, rebut the staleness argument, are the primary if not entire point of the paragraph in the affidavit, and are unchallenged by Tam.

Tam also points out that the toll records show calls <u>between</u> TT-1 and TT-2, and argues that "given the failure to inform the court of the history of calls between TT-1 and TT-2 . . . the only rational explanation for this is that different people were using TT-1 and TT-2 and, therefore, that Tam was not using TT-2." Doc. No. 356 at 5-6. Not so. In a recorded jailhouse call on December 11, 2020, Tam stated his phone would "go silent." Doc. No. 327-2 at 41. This reasonably supports the inference that Tam would turn to another phone for illegal activity. TT-2 was a phone activated on December 3, 2020, i.e., just before the "go silent" statement. <u>Id.</u> at 42. The contacts on TT-2 included substantial overlap with TT-1 contacts <u>and</u> included contacts with phones used by other co-conspirators including Ostrander, Padova, Nolan, and Nguyen. <u>Id.</u> These facts led the affiant to the conclusion that Tam had "transitioned <u>some</u> of his drug activity from TT-1 to TT-2." <u>Id.</u> (emphasis added). The affidavit also informed the Court that TT-2 was used to communicate with Tam's "family members." <u>Id.</u>

Other facts support the connection between Tam's drug dealing and TT-2. TT-2 had numerous contacts with SOI-1 surrounding Tam's documented meeting with SOI-1. Doc. 327-2 at 44. Both phones, TT-1 and TT-2, had communications with SOI-1 surrounding the drug purchase from Tam described to Boston Police by SOI-2. Doc. 327-2 at 46. In February 2022, TT-2 had contacts with Ostrander, a target named in the affidavit. Doc. No. 327-2 at 15, 49.

The affidavit reported all of the foregoing to the Court as part of the request for the wiretap. In light of this evidence, that the affidavit did not report calls between TT-1 and TT-2 fails to justify convening a <u>Franks</u> hearing. The additional fact—that the phones called each other—does not support the conclusion Tam suggests, that "Tam was not using TT-2." Doc. No.

356 at 6. There was ample probable cause to intercept TT-2 with or without the additional fact. There was ample probable cause to conclude Tam used TT-2 at least sometimes to conduct "some" of his drug dealing activity. Doc. No. 327-2 at 42. At most, the additional fact suggests what is otherwise obvious from and asserted by the affidavit—that Tam was engaged in jointly undertaken criminal activity with other people resulting in, at times perhaps, another person also using TT-2 for this criminal activity. Neither individually, nor collectively, do the arguments or facts advanced by Tam warrant a <u>Franks</u> hearing. Accordingly, the Motion, Doc. No. 290, is DENIED insofar as it requests a <u>Franks</u> hearing.

C.   <u>Search of Premises</u>

Tam's argument surrounding his Motion to Suppress Search of the Premises, Doc. No. 288, is predicated on a favorable ruling from the Court on his Motion to Suppress the Wiretap. <u>See</u> <u>id.</u> ("When the Court suppresses [the information gained from the wiretaps], the applications for the May 3, 2021, search warrants will lack sufficient nexus to show that evidence of the charged offenses would be found on the premises."). Because the Court declines to suppress the fruits of the wiretap, the Court similarly declines to suppress the fruits of the premises search, as the warrant was supported by probable cause. The Motion to Suppress the Search, Doc. No. 290, is DENIED.

III.   <u>CONCLUSION</u>

For the foregoing reasons, the Court DENIES AS MOOT Defendant's Motion to Suppress Statement, Doc. No. 284, DENIES Defendant's Motion to Suppress Wiretap, Doc. No. 290, and DENIES Defendant's Motion to Suppress Search of Premises, Doc. No. 288. The Court also DENIES Defendant's Motion for Leave to File Reply and Request for an Evidentiary

Hearing, Doc. No. 385, as stated herein and ALLOWS Defendant's Motion for Leave to File

Reply, Doc. No. 395.

SO ORDERED.

 /s/ Leo T. Sorokin
Leo T. Sorokin
United States District Judge